**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>TRISTAN HANDELL SMITH,<br><br>    *Defendant*. | Criminal Action No. 26-00026 (AHA) |

**Memorandum Opinion and Order**

Tristan Handell Smith moves to suppress evidence the government seized from a jeep he was in and statements he made, arguing they resulted from an unconstitutional search. The court grants the motion as to the evidence seized and denies the motion as to statements made.

**I.    Background[1]**

On the evening of January 29, 2026, Metropolitan Police Department ("MPD") officer Samuel Zambrano-Mora was patrolling by car with one other MPD officer and two federal law enforcement agents and saw a jeep with a crooked license plate. ECF No. 21 at 2–3; Draft Hr'g Tr. at 9, 16–17 (Apr. 24, 2026). Officer Zambrano-Mora radioed nearby patrol cars, telling them to pull the jeep over. ECF No. 21 at 4; Draft Hr'g Tr. at 28–29. Two other patrol cars joined Officer Zambrano-Mora's car, and they positioned themselves around the jeep. Draft Hr'g Tr. at 31. The three cars turned their lights and sirens on, and the jeep pulled over. *Id.* at 31, 38.[2]

---

[1]    The facts described reflect the court's findings based on the testimony and evidence presented at the court's suppression hearing and with accompanying briefing.

[2]    The government has presented evidence that officers had received an email about two hours earlier to look out for a "red/burgundy 2010ish Jeep Grand Cherokee" involved in a shooting nearby, emphasizing that it should be easy to spot because it is one of the "older models." Gov.

Officer Zambrano-Mora approached on the passenger side and another officer approached on the driver side. *See* Gov. Ex. 2 at 02:10–02:25; Gov. Ex. 3 at 02:00–02:10.[3] Officer Zambrano-Mora saw two people in the front of the vehicle and two in the back, and told the occupants to lower their windows. *See* Gov. Ex. 2 at 02:10–02:25; ECF No. 21 at 4. He then told the occupants they had been stopped because the vehicle's license plate was not horizontal to the ground. Gov.

---

Ex. 4; ECF No. 21 at 2. It is undisputed that the jeep here was not involved in the shooting. The court finds based on the live testimony at the court's suppression hearing and accompanying footage that Officer Zambrano-Mora's direction to stop the jeep was based only on the crooked license plate and that, by the time the officers stopped the jeep, they had determined it did not match the description or image of the Jeep model used in the shooting. Officer Zambrano-Mora testified that after he saw the vehicle here with the crooked license plate, he compared it to the vehicle depicted in the email. Draft Hr'g Tr. at 20–21. Officer Zambrano-Mora also ran the tags of the vehicle being stopped and was able to confirm it was not one of the distinct older Jeep models described in the email. *See id.* at 63–64; Gov. Ex. 4. Officer Zambrano-Mora therefore understood the jeep being stopped was not the jeep described in the email. He accordingly communicated to the other officers that the vehicle was being stopped because it had a crooked license plate, and not because it matched the description of the vehicle used in the shooting. *See* Draft Hr'g Tr. at 37–38 (Officer Zambrano-Mora explaining that the body worn camera footage shows him making hand gestures to explain the license plate violation to other officers); Gov. Ex. 2 at 01:35–01:50 (body worn camera footage showing Officer Zambrano-Mora explaining the license plate violation shortly before the stop); *see also* ECF No. 21 at 3–4 (stating that Officer Zambrano-Mora ordered the traffic stop based on his observation of the crooked license plate). Indeed, in the radio transmissions leading up to the stop, Officer Zambrano-Mora does not mention the earlier shooting at all and only tells accompanying patrol cars that they are stopping the vehicle here for improper display of tags. Gov. Ex. 14 at 00:15–00:35. The court's finding is also consistent with the way the officers carried out the traffic stop, without the type of caution that would accompany suspicion that the passengers of the vehicle had just fired a gun; instead, the officers verbally confirm with the passengers that the vehicle had not been out earlier and that there are no weapons in it, and tell the passengers they were stopped because of their license plate. *See* Gov. Ex. 2 at 02:10–05:35; Gov. Ex. 3 at 02:00–03:25. It is also consistent with the arrest report, *Gerstein* affidavit, preliminary hearing testimony, statement of offense, and grand jury testimony, none of which mention the earlier shooting as a basis for the stop. *See* Draft Hr'g Tr. at 61–63; *see also id.* at 79–80 (Officer Zambrano-Mora testifying that it is routine for this task force to conduct stops based solely on traffic violations, including improper display of tags), 122–123 (Agent Kelly testifying that it is very common for this task force to stop vehicles for license plate violations). On these facts, the court does not credit any account in which officers pulled the vehicle over based on the earlier shooting.

[3]    Citations to the government's Exhibit 2 and Exhibit 3, the body-worn camera footage of Officer Zambrano-Mora and Officer Leonardo Bell respectively, refer to the exhibits the government submitted with briefing, before the court's suppression hearing.

Ex. 2 at 02:53–03:00. He asked the front passenger, Smith, for ID, and Smith provided it. *Id.* at 03:40–04:20. After asking a few more questions, Officer Zambrano-Mora asked both the driver and Smith to get out of the vehicle. *Id.* at 04:20–05:55. After they got out, a federal officer who was present, Diplomatic Security Service Agent Ryan Kelly, looked into the vehicle from the driver-side window, shined his flashlight on the inside of the front passenger door, and asked Officer Zambrano-Mora: "Is that a pipe? Hey Z, is that a pipe in the . . . ." *Id.* at 06:10–06:15; Draft Hr'g Tr. at 92–93. Officer Zambrano-Mora responded to the question by leaning his head through the passenger-side window, allowing him to look down and see a clear pipe in the passenger-side door. Gov. Ex. 2 at 06:15–06:25. Officer Zambrano-Mora took the pipe and then opened the passenger-side door, at which point he found a digital scale on the floor. *Id.* at 06:20–06:40. Officers then physically searched through the whole vehicle, finding two bags of methamphetamine. *See id.* at 09:40–10:35; ECF No. 21 at 7.

The government charged Smith with unlawful possession with intent to distribute fifty grams or more of methamphetamine and five hundred grams or more of a mixture or substance containing a detectable amount of methamphetamine in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A)(viii). ECF Nos. 1, 12. Smith moves to suppress the evidence taken from the vehicle and any statements he made that night, arguing they were the fruits of an unlawful seizure and unlawful search. ECF No. 19.

## II.    Discussion

The Fourth Amendment protects against "unreasonable searches and seizures." U.S. Const. amend. IV. Determining whether the government has violated the Fourth Amendment therefore generally requires a court to consider whether a "search" or "seizure" has occurred and, if so, whether the search or seizure was unreasonable. The Supreme Court has instructed that warrantless searches, like the one here, "are *per se* unreasonable under the Fourth Amendment—subject only

to a few specifically established and well delineated exceptions." *Minnesota v. Dickerson*, 508 U.S. 366, 372 (1993). And "when a search or seizure is warrantless the government carries the burden of justifying the agent's actions." *United States v. Singleton*, 759 F.2d 176, 181 (D.C. Cir. 1985). If the government does not satisfy this burden, "the remedy is generally exclusion—courts must suppress the unlawfully obtained evidence and any derivative evidence tainted by the violation unless an exception applies." *United States v. Green*, 149 F.4th 733, 743 (D.C. Cir. 2025).

Smith argues that the evidence obtained from the vehicle and any statements he made are the fruits of an unreasonable seizure because the patrol cars that pulled him over were driven by federal agents who lack authority to conduct traffic stops in the District. ECF No. 19 at 4–8. He also argues the evidence and statements are the fruits of an unreasonable search because the government lacked a warrant, and no exception to the warrant requirement applied, when Officer Zambrano-Mora stuck his head inside the vehicle window to find the pipe. *Id.* at 3–4, 16–17. Because the court agrees with the latter argument, it need not reach Smith's broader argument concerning the authority of federal law enforcement agents to conduct traffic stops in the District.

### A. Officer Zambrano-Mora Conducted An Unreasonable Search When He Stuck His Head Into The Jeep Window Without A Warrant Or Probable Cause

It is well settled that the inside of a car is "subject to Fourth Amendment protection from unreasonable intrusions by the police" and therefore intrusions into a car's interior are a "search" that must be reasonable under the Fourth Amendment. *New York v. Class*, 475 U.S. 106, 114–15 (1986). The court therefore considers at what point the government conducted a "search" of the jeep and whether the search was reasonable.

Smith argues, and the government concedes, that an officer commits a "search" within the meaning of the Fourth Amendment by sticking his head through a vehicle's window. *See* Draft Hr'g Tr. at 167 (the government conceding that crossing the plane of a car window is a search

4

within the meaning of the Fourth Amendment); *see also United States v. Powell*, 483 F.3d 836, 838–39 (D.C. Cir. 2007) (taking for granted that a search occurred where officer "leant his head into the vehicle" and upholding the car search based on probable cause to arrest).

Having considered the evidence and testimony at the suppression hearing, the court finds that Officer Zambrano-Mora did stick his head through the vehicle's window. After Agent Kelly asked Officer Zambrano-Mora if there was a pipe in the passenger-side door, Officer Zambrano-Mora's body worn camera shows Officer Zambrano-Mora approach the door and press his body against the vehicle, consistent with him leaning forward into the window. Gov. Ex. 2 at 06:15–06:20. And based on details shown in the camera footage and described in testimony about the stop, including Officer Zambrano-Mora's position outside the jeep and the fact that he found the pipe inside the door handle, the court finds Officer Zambrano-Mora could not have seen the pipe without leaning through the passenger-side window. *See id*. The government has not meaningfully rebutted this understanding of the events. When asked about it at the hearing, Officer Zambrano-Mora testified that he could not remember whether he stuck his head through the window and the government later appeared to concede that Officer Zambrano-Mora crossed the plane of the passenger window to find the pipe. *See* Draft Hr'g Tr. at 49–50, 68; *id.* at 174 (government acknowledging "[i]t certainly looks like someone is bending over" into the vehicle's window from Officer Zambrano-Mora's body camera footage). The court therefore finds Officer Zambrano-Mora leaned his head through the window and concludes, consistent with the parties' positions, that this was a Fourth Amendment search.[4]

---

[4]    Smith premises his argument on Supreme Court and D.C. Circuit precedent grounded in the reasonable expectation of privacy in the interior of a car. *See* ECF No. 19 at 13–17 (citing *New York v. Class*, 475 U.S. 106 (1986); *United States v. Powell*, 483 F.3d 836 (D.C. Cir. 2007)); Draft Hr'g Tr. at 148–49. Sticking a head through a car window to see what is inside of it would likely

The court also concludes the government has not satisfied its burden to show the search was reasonable. As set forth above, the Supreme Court has held a warrantless search like the one here is "*per se* unreasonable" absent an exception to the warrant requirement. *Dickerson*, 508 U.S. at 372. The government asserts three exceptions, but none work on the facts here.

First, the government argues that Officer Zambrano-Mora saw the pipe in plain view. ECF No. 21 at 9–10. The plain view doctrine recognizes that "if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant." *Dickerson*, 508 U.S. at 375. But, as found above, Officer Zambrano-Mora could not see the pipe from his position outside of the vehicle; he could see it only after he leaned his head through the window. The government's plain view argument therefore just begs the question of whether Officer Zambrano-Mora was "lawfully in a position from which" he could see the pipe after he stuck his head into the jeep window. *Id*.

Second, the government argues Officer Zambrano-Mora's search can be upheld under the automobile exception which allows officers to conduct a warrantless car search "so long as they have probable cause to do so." *United States v. Jenkins*, 984 F.3d 1038, 1041 (D.C. Cir. 2021). "A police officer has probable cause to conduct a search when the facts available to him would warrant

---

also be a search under the Fourth Amendment's property-based test because it "obtains information by physically intruding" into the car. *United States v. Jones*, 565 U.S. 400, 406 n.3 (2012); *see also United States v. Ngumezi*, 980 F.3d 1285, 1289 (9th Cir. 2020) (holding that an officer searched a car under the property-based test when he "leaned in across the plane of the door" because even though the intrusion "may have been modest" it "is constitutionally significant"). The court need not reach this issue, because the government has not contested Smith's reasonable expectations argument. *See* Draft Hr'g Tr. at 167–68; *see also Florida v. Jardines*, 569 U.S. 1, 11 (2013) (recognizing that the reasonable-expectations test "'has been *added to*, not *substituted for*,' the traditional property-based understanding of the Fourth Amendment" (quoting *Jones*, 565 U.S. at 409)).

a person of reasonable caution in the belief that contraband or evidence of a crime is present." *Id.* (cleaned up). "Probable cause is synonymous with 'fair probability,' and it is an objective standard requiring an analysis of the totality of the circumstances and the facts known to the officers at the time of the search." *United States v. Jackson*, 415 F.3d 88, 91 (D.C. Cir. 2005) (citations omitted).

But the government has not shown Officer Zambrano-Mora had probable cause to believe there was any contraband or evidence of a crime in the jeep at the time he stuck his head through the window. Before that time, the driver and Smith answered the officers' questions and complied with all instructions, including to get out of the vehicle. *See* Gov. Ex. 2 at 02:20–06:05; Gov. Ex. 3 at 02:00–05:45. The government tried to make the case that Officer Zambrano-Mora might have seen the pipe in the passenger-side door during the brief moment when Smith opened the door to get out of the jeep and that Smith promptly closing the door upon exiting the vehicle suggested he was trying to hide something. Draft Hr'g Tr. at 47, 49. But based on the court's consideration of the testimony at the suppression hearing and the accompanying body worn camera footage, it finds Officer Zambrano-Mora did not see the pipe in the door when Smith exited the vehicle and that Smith did not do anything suspicious when he exited the vehicle; he got out and closed the door behind him like any person would do. *See* Gov. Ex. 2 at 06:00–06:05. The notion that Officer Zambrano-Mora saw the pipe during the brief period when Smith was exiting the jeep also conflicts with the fact that he looked for it only after Agent Kelly asked him whether there was a pipe in the door. *See id.* at 06:10–06:15.

The government also argues that, even if Officer Zambrano-Mora did not see anything that would give him probable cause to stick his head into the window, Agent Kelly saw enough to have probable cause, and Agent Kelly's knowledge can be imputed to Officer Zambrano-Mora. Draft Hr'g Tr. at 168–70. The question of when and how an officer's observations can be imputed to

another officer on a theory of "collective knowledge" is the subject of disagreement. *Compare United States v. Cook*, 277 F.3d 82, 86 (1st Cir. 2002) (taking a broad view that "where law enforcement officers are jointly involved in executing an investigative stop, the knowledge of each officer should be imputed to others jointly involved in executing the stop"), *with United States v. Hussain*, 835 F.3d 307, 316 n.8 (2d Cir. 2016) (taking a narrower view that knowledge will not be imputed "[a]bsent record evidence that [an officer] communicated his suspicion or any relevant information to [another officer] before the latter began to conduct the protective search"). Our circuit has not endorsed a particular view, acknowledging only that officers with probable cause to stop and search a car may direct other officers to execute that stop and search. *See United States v. Burnett*, 827 F.3d 1108, 1113–15 (D.C. Cir. 2016); *see also United States v. Gorham*, 317 F. Supp. 3d 459, 471 (D.D.C. 2018) (explaining that the D.C. Circuit has not decided whether the "more sweeping view of the collective knowledge doctrine withstands scrutiny"). But the government's argument here fails under any theory because Agent Kelly did not see anything that would have given him probable cause in the first place. Based on the court's review of the record and the live testimony, it finds that, at the time Officer Zambrano-Mora leaned into the window, Agent Kelly could not tell whether he had seen a pipe in the door and had not seen any unlawful conduct in the jeep. To the contrary, upon seeing a clear object, Agent Kelly specifically asked Officer Zambrano-Mora twice, "Is that a pipe?" Gov. Ex. 2 at 06:10–06:15; *see also* Draft Hr'g Tr. at 93 (Agent Kelly testifying that he saw "[w]hat appeared to be a pipe"). The court credits that Agent Kelly could see a small, clear object in the door, but finds he could not tell from his vantage point whether it was a pipe or something else. Seeing a small, clear object in a vehicle does not

8

give rise to a "fair probability" that there is evidence of a crime in the vehicle. *Jackson*, 415 F.3d at 91.[5]

Third, the government argues Officer Zambrano-Mora was justified in leaning through the window as part of a "limited weapons pat-down" under *Michigan v. Long*, 463 U.S. 1032 (1983). Draft Hr'g Tr. at 175–76. There, the Supreme Court recognized that officers may reasonably carry out a protective search of a car's passenger compartment when they have a reasonable belief "that the suspect is dangerous and the suspect may gain immediate control of weapons." *Long*, 463 U.S. at 1049; *see also id*. at 1051 (holding officers may "conduct an area search of the passenger compartment to uncover weapons, as long as they possess an articulable and objectively reasonable belief that the suspect is potentially dangerous"). But that has no application here. As the court already found, at the time the officers stopped the jeep, they did so solely based on the license plate infraction, and they had no basis to infer that any of the passengers were dangerous. *See supra* at 2 n.2.

---

[5]   Short of seeing the pipe, the government argues that Officer Zambrano-Mora and Agent Kelly saw various other things before Officer Zambrano-Mora crossed the plane of the passenger window. It argues, for instance, that the officers might have inferred the presence of meth use if Agent Kelly had seen smoke or residue on the glass pipe; if Agent Kelly saw drug packaging material in the door; if either officer saw odorless smoke emanating from the jeep; or if Officer Zambrano-Mora saw the plastic bubble wrap that was later found in Smith's bag, when Smith was pulling out his ID. Draft Hr'g Tr. at 44–46, 91, 93–94; ECF No. 21 at 9–10. But on the court's review of the video footage and accompanying live testimony, the court finds the government has not satisfied its burden to establish the officers saw these things before the search. Having found that Agent Kelly could not see the pipe, the court also finds he would not have been able to see any residue on the pipe. As for drug packaging material, Agent Kelly misidentified this, saying he saw baggies when it turned out to be bubble wrap, and he did not point out the "baggies" until after Officer Zambrano-Mora stuck his head through the window and verbally confirmed there was a pipe. *See* Gov. Ex. 2 at 06:10–06:35; ECF No. 21 at 7. And the notion that Agent Kelly saw smoke conflicts with other testimony that the pipe was not smoking when it was retrieved. *See* Draft Hr'g Tr. at 69. Similarly, Officer Zambrano-Mora never mentioned odorless smoke or seeing bubble wrap during or after the stop, in his arrest report, *Gerstein* affidavit, statement of offense, preliminary hearing testimony, or grand jury testimony. *See id.* at 71–72.

The court therefore concludes the government has failed to justify its warrantless search of the jeep. Because Smith has shown "a causal nexus between the Fourth Amendment violation and the evidence he seeks to suppress"—that Officer Zambrano-Mora saw the pipe only after sticking his head in the window—"the evidence must be suppressed unless the government proves, by a preponderance of evidence, that the evidence would have been discovered inevitably, was discovered through independent means, or that its discovery was so attenuated from the illegal search or seizure that the taint of the unlawful government conduct was dissipated." *United States v. Holmes*, 505 F.3d 1288, 1292–93 (D.C. Cir. 2007). The government has not asserted any of these arguments or otherwise challenged suppression as the appropriate remedy if the search here was unreasonable.[6] Nor does the government contest that the evidence seized from the jeep were the "fruits" of unlawful action, obtained as "a direct result" of Officer Zambrano-Mora's search. *Wong Sun v. United States*, 371 U.S. 471, 484–85 (1963); *see also* ECF No. 21 at 9 (acknowledging that "only after observing the glass pipe with the residue did MPD Officer Zambrano-Mora open the door to investigate further").[7]

### B. Smith Has Not Shown That Suppression Of Any Statements Is Warranted

---

[6]   Although it did not do so in its briefing, at the court's suppression hearing, the government cast its argument that Officer Zambrano-Mora conducted a protective sweep under *Michigan v. Long* as one of "inevitable discovery"—namely, that the officers could lawfully search the jeep for weapons and, in the course of doing so, would have found the pipe. Draft Hr'g Tr. at 163–65; *see Holmes*, 505 F.3d at 1293 ("To prevail on an inevitable discovery theory, the government must prove by a preponderance of the evidence that, even without the unlawful [search], the evidence it seeks to admit would have been discovered anyway."). For the reasons stated, the government's reliance on *Long* is misplaced here, because the officers stopped the jeep solely for the license plate infraction and thus had no basis to perform a protective sweep.

[7]   Because the court concludes Officer Zambrano-Mora conducted an unreasonable search when he stuck his head in the jeep window, it need not address Smith's arguments that officers conducted a search by ordering the jeep's passengers to roll down their windows or when other officers crossed the plane of the vehicle.

In passing throughout his motion, Smith asks the court to suppress "statements collected" after the jeep was searched. *See* ECF No. 19 at 1, 16–17, 20. It is true that "verbal evidence" can be fruit of, and therefore properly suppressed after, an unlawful search. *Wong Sun*, 371 U.S. at 485; *see United States v. Darwah*, No. 25-cr-194, 2026 WL 145612, at *14 (D.D.C. Jan. 20, 2026) ("A defendant's statements may be the fruit of an unlawful search or seizure and subject to the Fourth Amendment's exclusionary rule."). But here, Smith does not identify the statements he seeks to suppress or show that the statements identified are fruits of the unlawful search. The court therefore denies the motion to suppress without prejudice insofar as it relates to any unspecified statements.

## III.    Conclusion

For these reasons, the court grants in part and denies in part Smith's motion to suppress, ECF No. 19. The motion is granted as to suppression of physical evidence seized from the jeep, and denied as to suppression of statements. The court need not reach Smith's broader argument concerning the authority of federal law enforcement agents to conduct traffic stops in the District.

_____
AMIR H. ALI
United States District Judge

Date:   July 22, 2026